UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WESTCHESTER SURPLUS LINES INSURANCE COMPANY, | Case No. 16-cv-07282-WHO |
| Plaintiff, | |
| v. | **ORDER REGARDING MOTIONS FOR SUMMARY JUDGMENT** |
| LIBERTY MUTUAL INSURANCE COMPANY, | |
| Defendant. | |

## INTRODUCTION

Plaintiff Westchester Surplus Lines Insurance Co. ("Westchester") brings an action against defendant Liberty Mutual Insurance Co. ("Liberty Mutual") for equitable contribution stemming from Westchester's defense and indemnity of Tractel, Inc. ("Tractel") following an accident occurring on August 4, 2011 at a residential building located at 300 Berry Street in San Francisco, California. Westchester, which insured Tractel as part of a "wrap up" insurance program, argues that it is entitled to equitable contribution from Liberty Mutual because both parties previously issued a primary insurance policy to Tractel, while Liberty Mutual contends that its policy carves out coverage when a wrap up insurance program applies and that it had no obligation, equitable or otherwise, to defend Tractel in that circumstance. Both parties moved for summary judgment. For the reasons discussed below, Westchester is not entitled to equitable contribution from Liberty Mutual. I grant Liberty Mutual's motion and deny Westchester's.

## BACKGROUND

### I. FACTUAL BACKGROUND

#### A. The Owner Controlled Insurance Program

In 2006, Arterra Mission Bay, LLC began work on the construction of 268 mid-level

condominiums and townhome units in the Mission Bay area of San Francisco (the "Arterra Project"). *See* Declaration of Nancy Adams ("Adams Decl."), Ex. 1, Tractel/Bovis Subcontract, at Ex. B.1 at 1 (Dkt. No. 35-1). As a part of the Arterra Project, the owner created an owner controlled insurance program ("OCIP") in order to provide insurance coverage to contractors working on the project. *See* Adams Decl., Ex. 2, OCIP Manual at 5 (Dkt. No. 35-2). Enrollment and participation in the OCIP were mandatory for all the contractors working on the project. *Id.* Westchester issued the wrap up insurance policy, providing primary general liability coverage under the OCIP. *See* Adams Decl., Ex. 3, Westchester Policy at Endorsement No. 1 (ECF p. 7) (Dkt. No. 35-3).

Tractel was awarded a subcontract with Bovis Lend Lease as a part of the Arterra Project, related to the construction and installation of the Exterior Building Maintenance System that facilitates window washing and other exterior building maintenance. *See* Adams Decl., Ex. 1, Tractel/Bovis Subcontract, at 1, Ex. B.1 at 2 (Dkt. No. 35-1). The Tractel/Bovis Subcontract incorporates the OCIP Manual by reference. *See id.* at 15 (listing "Exhibit C.1 (Wrap-Up Manual)" as a contract document). Even though Tractel was already insured by Liberty Mutual, per the terms of the subcontract Tractel was obligated to enroll in the OCIP and pay premiums to Westchester, which it did. *See* Adams Decl., Ex. 4, Lockton Insurance Brokers OCIP Enrollment Spreadsheet (Dkt. No. 35-4) (listing Tractel as an "enrolled contractor").

**B.    The Westchester Policy**

Westchester issued a general liability policy to Mission Bay LLC, effective from May 1, 2006 to March 1, 2009. Corona Decl., Ex. 3, Westchester Policy (Dkt. No. 32-6). By endorsement, Mission Bay LLC and "all subcontractors that are enrolled in the [OCIP]" were the "Named Insured" for the Westchester policy. *Id.* ¶ 12; Adams Decl., Ex. 3, Westchester Policy at Endorsement No. 1 (ECF p. 7).

Relevant to this action, the Westchester Policy contains an "Other Insurance" provision that states:

> 4. Other Insurance
>
> If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of this Coverage Part, our

obligations are limited as follows:

a. Primary Insurance

This insurance is primary except when b. below applies.  If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary.  Then, we will share with all that other insurance by the method described in c. below.

b. Excess Insurance

This insurance is excess over:
(1)    Any of the other insurance, whether primary, excess, contingent or on any other basis:

(a) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work". . .;

(2)    Any other primary insurance available to you covering liability for damages arising out of the premises or operations    for which you have been added as an additional insured by    attachment of an endorsement.

c. Method of Sharing

If all of the other insurance permits contribution by equal shares, we will follow this method unless the insured is required by contract to provide insurance that is primary and non-contributory, and the "insured contract" is executed prior to any loss.  Where required by a contract, this insurance will be primary only when and to the extent as required by that contract.  However, under the contributory approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.  If any of the other insurance does not permit contribution by equal shares, we will contribute by limits.  Under this method, each insurer's share is based on the ratio of the applicable limit of insurance to the total applicable limits of insurance of all insurers.

Adams Decl., Ex. 3, Westchester Policy at Section IV ¶ 4, as amended by Endorsement No. 25

(ECF pp. 33, 57).

**C.      The Liberty Mutual Policy**

Liberty Mutual issued a Commercial General Liability policy to Tractel North America, Inc., effective from May 1, 2011 to May 1, 2012.  *See* Adams Decl., Ex. 11, Liberty Mutual Policy at Declarations (ECF p.5) (Dkt. No. 35-11).  By endorsement, Tractel, Inc. is a named insured on the policy.  *Id.* at Endorsement No. 19 (ECF p. 51).  Relevant to this action, the Liberty Mutual Policy contains an "Other Insurance" provision and a "Difference in Conditions/Difference in Limits Endorsement Wrap Up Liability" provision.  *See id.* at Section VIII ¶ 12 (ECF p.23),

Endorsement No. 9 (ECF p. 35).

The "Other Insurance" provision provides that:

> The coverage afforded by this Policy is primary insurance, except when stated to apply in excess of or contingent upon the absence of other insurance. When this insurance is primary and the "Insured" has other insurance, which is applicable to a loss on an excess or contingent basis, the Limits of Liability under this Policy will not be reduced by the existence of such other insurance. When insurance provided by this Policy and by "other insurance" apply to a loss on the same basis, whether primary, excess or contingent, the Insurer will be liable under this Policy for the proportion of such loss stated in the applicable contribution provision below:
>
> (a) Contribution by Equal Shares:
>
> If all "other insurance" provides for contribution by equal shares, the Insurer will also follow this method. Under this method, each insurer contributes equal amounts until it has paid its applicable limit of liability or the full amount of the loss is paid, whichever comes first.
> (b) Contribution by Limits:
>
> If any "other insurance" does not provide for contribution by equal shares, the Insurer will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of liability to the total limits of liability of all insurers.

*Id.* at Section VIII ¶ 12 (ECF p.23).

The "Difference in Conditions/Difference in Limits Endorsement Wrap Up Liability" provision provides that:

> To the extent that this Policy affords broader coverage or higher limits of liability than any wrap-up liability policy in place to cover the "Insured's work", this policy is extended to provide coverage for the "Insured", subject to the following conditions:
>
> (a)  no coverage is provided under this Policy for any claim that is below the amount of any applicable deductible contained in any wrap-up liability policy;
>
> (b)  no coverage is provided under this Policy for any claim arising out of the "Insured's work" for damage to any property under construction or any property forming part of the insured project under any wrap-up liability policy; and
>
> (c)  if coverage applies under both this Policy and a wrap-up liability policy and the limits of liability provided by this Policy is greater, this Policy is restricted to provide coverage only for the difference between the greater limit of liability applicable to this Policy and the lower limit of liability applicable to the wrap-up liability policy

*Id.* at Endorsement No. 9 (ECF p. 35).

### D. The Underlying Accident and Litigation

On August 4, 2011, Benito Carrera and Raul Carrera were working as window washers at a residential building located at 300 Berry Street, San Francisco. Adams Decl., Ex. 5, Carrera Complaint ¶¶ 4-5 (Dkt. No. 35-5). Benito Carrera alleges that he heard "a sudden loud metallic noise, and one side of the scaffolding support system failed and the scaffolding fell precipitously about 3 floors down." *Id.* ¶ 6. He was injured, *id.* ¶¶ 11-12, and filed suit with his wife and Raul Carrera in the Superior Court of the State of California, County of San Francisco, captioned *Carrera & Alfaro v. Tractel, Inc., et al.*, case number CGC-11-515902 (the "Underlying Litigation"). *Id.* The plaintiffs asserted three counts against Tractel: (i) Negligence; (ii) Negligent Infliction of Emotional Distress; and (iii) Loss of Consortium. Corona Decl., Ex. 2, First Amended Complaint (Dkt. No. 32-5).

Tractel tendered the defense and indemnity of the Underlying Litigation to Westchester. Corona Decl. ¶ 9 (Dkt. No. 32-2). Westchester assumed the defense under the terms and conditions of the Westchester Policy. *See id.*; Adams Decl., Ex. 8, Westchester Reservation of Rights Letter (December 9, 2011) (Dkt. No. 35-8). On October 1, 2015, the Underlying Litigation was settled for $1,352,500, with Westchester paying (i) $415,000 to the workers' compensation insurer that was providing benefits to Plaintiff Carrera; (ii) $540,000 to Benito Carrera; (iii) $12,500 to Gloria Alfaro; and (iv) $385,000 to Raul Carrera. Corona Decl. ¶¶10-11. Westchester also paid (i) $9,000 to resolve a subrogation claim; (ii) $65,926.81 to the Arterra Homeowner Association for a property damage claim; and (iii) $318,740.39 in defense fees and costs. *Id.* Liberty Mutual did not contribute any amount to the settlement.

## II. PROCEDURAL BACKGROUND

On December 21, 2016, Westchester filed this action against Liberty Mutual. Compl. (Dkt. No. 1). Westchester asserts a cause of action for equitable contribution, alleging that as a matter of "fairness and equity," Liberty Mutual should have paid an equal share of the costs of indemnification and defense of Tractel in the Underlying Litigation. *See id.* ¶ 22. Both parties now move for summary judgment on the equitable contribution claim. (Dkt. Nos. 30, 32)

**LEGAL STANDARD**

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial." *Id.* The party opposing summary judgment must then present affirmative evidence from which a jury could return a verdict in that party's favor. *Anderson v. Liberty Lobby,* 477 U.S. 242, 257 (1986).

On summary judgment, the Court draws all reasonable factual inferences in favor of the non-movant. *Id.* at 255. In deciding a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* However, conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir.1979).

**DISCUSSION**

Liberty Mutual argues that it is entitled to summary judgment on Westchester's equitable contribution claim because (i) the Westchester Policy was intended to be the sole insurance policy applicable for job site related claims against an OCIP-enrolled contractor and (ii) the Liberty Mutual Policy expressly provided that, when Tractel is insured under an OCIP policy, the Liberty Mutual Policy is excess over the applicable limits for the OCIP policy. I agree.

**I.    LIBERTY MUTUAL'S POLICY ACTS AS EXCESS OVER WESTCHESTER'S**

Westchester contends that both the Liberty Mutual Policy and the Westchester Policy insured Tractel as primary policies for the Underlying Litigation, and because the Liberty Mutual Policy is not a "true" excess policy, the Westchester Policy and the Liberty Mutual Policy are at the same level of risk. Liberty Mutual concedes that its policy is not a "true" excess policy

because it generally provides primary insurance to Tractel. But where Tractel is insured under a wrap-up policy, such as the OCIP for the Arterra Project, the Liberty Mutual Policy responds on an excess basis. It contains specific coverage carve outs when Tractel is also covered by wrap-up insurance. *See* Adams Decl., Ex. 11, Liberty Mutual Policy, at Endorsement No. 9 (ECF p. 35). Section VIII ¶12 (ECF p. 23) ("The coverage afforded by this Policy is primary insurance, except when stated to apply in excess of . . . other insurance"). Liberty Mutual contends that Endorsement 9 of its policy renders the Liberty Mutual Policy excess to the OCIP.

Westchester argues that Endorsement 9 is not applicable on its plain terms because the Liberty Mutual Policy does not afford higher limits of liability than the Westchester Policy. Its argument ignores that Endorsement 9 also applies where the Liberty Mutual Policy affords broader coverage than the Westchester Policy. Liberty Mutual provides several examples of how its policy provides broader coverage than the Westchester Policy, such that if implicated, Liberty Mutual would need to provide coverage to the Insured subject to limiting conditions (a)-(c) in its Policy; it would not provide coverage for (a) any claim below the amount of any applicable deductible of the wrap-up policy or (b) any claim "arising out of the "Insured's work" for damage to any property under construction or any property forming part of the insured project under any wrap-up liability policy." Further, Liberty Mutual would provide coverage for claims for which the limits of liability for the Liberty Mutual Policy were greater (c) only for the difference between the Liberty Mutual Policy and the wrap up policy. *See* Adams Decl., Ex. 11, Liberty Mutual Policy, at Endorsement No. 9 (ECF p. 35). While Westchester contends that these examples are immaterial and irrelevant because Liberty Mutual has not demonstrated that it covered defense fees or settlement funds excluded by the Westchester Policy, it is the potential reach of the policy, not how it applied in this circumstance, that is germane. Either the Liberty Mutual Policy provides no coverage for loss also subject to a wrap-up policy or it provides coverage subject to the language of Endorsement 9. Regardless, Endorsement 9 is applicable on its plain terms.

Westchester also argues that Endorsement 9 is not applicable because it only applies to a wrap-up policy to cover "the Insured's work," and Tractel's role for the Arterra Project that gave rise to liability was to supply a product. Westchester contends that Tractel supplied a defective

product through its off-site operations, which is not a risk that the OCIP policy was intended to cover.  But Westchester expressly disavowed this "product defect" defense as a coverage position. Adams Decl., Ex. 16, August 30, 2011 Email (Dkt. No. 39-1) ("[Westchester] is not distinguishing between the manufacturing issue and the installation issue . . . [and will not] attempt to claim this was a product defect and deny liability").  It cannot now contradict that position to assert that the Underlying Litigation involved a product defect such that Endorsement 9 was not triggered. Moreover, the work that Tractel performed on the Arterra project extended beyond merely providing a product.  *See* Adams Decl., Ex. 1 at Ex. B.1 at 2 (detailing the scope of Tractel's work for the Arterra Project).  Tractel's work and the subsequent claims arise out of its "onsite" activities.  Westchester's argument that Endorsement 9 was not triggered because Tractel's role for the Arterra Project that gave rise to liability was to supply a product fails.

Westchester then asserts that even if Endorsement 9 is applicable, it should be disregarded as an unenforceable "other insurance" clause because (1) "other insurance" provisions are strongly disfavored and (2) Endorsement 9 is an unenforceable excess "other insurance" provision.  *See Travelers Casualty & Surety Co. v. Century Surety Co.*, 118 Cal. App. 4th 1156, 1159-64 (2004) (invalidating an excess insurance provision as an escape clause).  Accordingly, Westchester argues that Endorsement 9, which it describes as both an "excess only" and "escape" clause, should not be enforceable.  An "excess only" clause "require[s] the exhaustion of other insurance; in effect, this insurer does not provide primary coverage but only acts as an excess insurer." *Residence Mut. Ins. Co. v. Travelers Indem. Co.*, 26 F.Supp.3d 965, 975 (C.D. Cal. 2014).  An "escape" clause "extinguishes the insurer's liability if the loss is covered by other insurance." *Id.*

Westchester is correct that courts have frequently decided against rigid enforcement of "other insurance" clauses.  *See Travelers Cas. & Surety Co.*, 118 Cal.App.4th at 1159-64; *CSE Ins. Group v. Northbrook Property & Cas. Co.* 23 Cal.App.4th 1839, 1845 (1994) (noting that "public policy disfavors 'escape' clauses whereby coverage purports to evaporate in the presence of other insurance").  But courts have rejected a bright line rule that "other insurance" clauses are always unenforceable.  *Compare Hartford Cas. Ins. Co. v. Travelers Indemnity Co.*, 110 Cal. App. 4th 710, 725-26 (2003) (noting that equitable considerations favor enforcement of the excess

clause as written), *with Fireman's Fund Ins. Co. v. Md. Cas. Co.*, 65 Cal. App. 4th 1279 (1998) (holding that, given the circumstances, a pro rata allocation for equitable contribution was appropriate). When insurance policies share the same risk but have "other insurance" clauses that are inconsistent, the general rule is to prorate according to the policy limits. *Armstrong World Indus., Inc. v. Aetna Cas. & Sur. Co.*, 45 Cal. App. 4th 1, 52 (1996).

Liberty Mutual relies on *Hartford* to argue that because the clauses at issue in this case are not inconsistent, the general rule to prorate does not apply. In *Hartford*, the court analyzed the "other insurance" provisions in each party's insurance policy. 110 Cal. App. 4th at 710. Each policy contained excess "other insurance" provisions. *Id.* at 726. As explained by the court, the policies each contained narrow exceptions to their operation as primary insurance and not merely broad "excess only" clauses that purport to make the coverage excess whenever there is other insurance. *Id.* "A clause that carves out this intended exception to primary coverage is not similar to an escape clause, where the insurer appears to offer coverage that in fact evaporates in the presence of other insurance." *Id.* at 726-27. The court also noted that where "excess only" clauses do not act as an escape clause, "equity should not be employed to override the terms of the insurance policies."

*Hartford* applies. Each insurance policy in this case states that it is primary insurance and states limited circumstances in which it does not apply as primary insurance. *See* Adams Decl., Ex. 3, Westchester Policy ¶ 4; Adams Decl., Ex. 11, Liberty Mutual Policy, at Endorsement 9, ¶12. Endorsement 9 is not a broad excess clause; it is rather a narrow exception to primary coverage. Where Tractel is enrolled in an OCIP, as it was for the Arterra Project, the Liberty Mutual Policy acted as an excess policy. *See* Adams Decl., Ex. 11, Liberty Mutual Policy, at Endorsement 9. It is not an escape clause "where the insurer appears to offer coverage that in fact evaporates in the presence of other insurance." *See Hartford*, 110 Cal. App. 4th at 726-27. Given that Endorsement 9 is a "narrow exception" rather than a broad excess clause and the circumstances under which the Westchester Policy acts as excess insurance were not triggered in the Underlying Litigation, it is clear that the "other insurance" provisions in the two policies do not conflict. This case is distinguishable from the cases in which the court found the "other

insurance" provisions to be conflicting and consequently unenforceable. Accordingly, Endorsement 9 is enforceable under California law.

"Contractual terms of insurance coverage are honored whenever possible. The courts will therefore generally honor the language of excess "other insurance" clauses when no prejudice to the interests of the insured will ensue." *Fireman's Fund Ins. Co.*, 65 Cal. App. 4th at 1303. Nothing in the record demonstrates that Tractel would be prejudiced by the language of Endorsement 9 of the Liberty Mutual Policy. Accordingly, I honor its language. Endorsement 9 renders the Liberty Mutual Policy excess to the Westchester Policy and "provide[s] coverage only for the difference between the greater limit of liability applicable . . . and the lower limit of liability applicable to the wrap-up liability policy." Because the Underlying Litigation was settled for an amount within the limits of the Westchester Policy, the Liberty Mutual Policy did not provide coverage.

## II.      EQUITY DOES NOT REQUIRE LIBERTY MUTUAL TO CONTRIBUTE

Liberty Mutual also argues that the Westchester Policy was intended to be the sole insurance policy applicable for job site related claims for the Arterra Project and so equitable considerations dictate the failure of Westchester's equitable contribution claim as a matter of law. In support, Liberty Mutual offers the OCIP manual for the Arterra Project as well as other extrinsic evidence. Westchester responds that such extrinsic evidence cannot be used to interpret ambiguous policy provisions, and even if the evidence is considered, it supports a finding in Westchester's favor.

Westchester relies on *Commerce & Industry Insurance Co. v. Chubb Custom Insurance Co.*, 75 Cal. App. 4th 739, 745 (1999), to argue that Liberty Mutual cannot use extrinsic evidence to demonstrate that Tractel intended for the Westchester Policy to be solely responsible for job site related claims for the Arterra Project. In *Commerce*, the insurer tried to support its argument that its policy was not intended to be primary insurance by submitting extrinsic evidence in an attempt to demonstrate that the policy in question was intended to provide contingent coverage. *Id.* The court rejected the extrinsic evidence, holding that it "cannot be used to substantiate unexpressed intention and thereby vary clear and explicit contract provisions." *Id.* at 746.

*Commerce* is inapposite. Liberty Mutual introduces extrinsic evidence to support its

equitable arguments, not to vary express contract provisions. It argues that "equity overrides the terms of the insurance policies." *Id.* at 749. For two insurers that arguably provide coverage for the same event, "[t]heir respective obligations flow from equitable principles designed to accomplish ultimate justice in the bearing of a specific burden. As these principles do not stem from agreement between the insurers, their application is not controlled by the language of their contracts with the respective policy holders." *Id.* Accordingly, to "accomplish ultimate justice," I can and should consider extrinsic evidence.

Liberty Mutual argues that review of the OCIP manual, in addition to the general function and purposes of OCIPs in the construction industry, demonstrates that the parties intended that the Westchester Policy would be the sole insurance implicated by all claims related to Tractel's onsite job activities for the Arterra Project, and that Liberty Mutual's policy carves out its obligation to provide primary insurance in this circumstance. Westchester takes the opposite view.

The OCIP is a wrap-up insurance program, designed to prevent the "plethora of third-party action litigation, in which the various parties associated with the project seek indemnification or contribution from other parties." 4 Steven G.M. Stein, Construction Law ¶ 13.08 (2009). It seeks to "reduce the incidence of insurance companies' disputes and litigation and the associated costs because the policies are with a single carrier that is responsible for claims." U.S. General Accounting Office, Advantages and Disadvantages of Wrap-Up Insurance for Large Construction Projects 4 (June 1999), *available at* http://www.gao.gov/archive/ 1999/rc99155.pdf. Given this backdrop, Liberty Mutual argues that the intended function of the OCIP was that the Westchester Policy would cover any claims and liabilities arising from the Arterra Project.

As mandated by Tractel's subcontract with Bovis Lend Lease, which incorporated the OCIP manual by reference, Tractel enrolled in the OCIP. *See* Adams Decl., Ex. 2, OCIP Manual, at 9. The cost of the Westchester Policy premium was deducted from the payments Tractel was due under the contract. Accordingly, Tractel is entitled to enjoy the benefits of an OCIP, specifically, the consolidated risk. By becoming the insurance carrier for the OCIP, Westchester received premiums from all contractors and subcontractors on the project in exchange for being the insurer for claims arising out of the Arterra Project. To allow Westchester to enjoy the

11

benefits of being an OCIP insurer without being subject to the inherent risk would not "accomplish ultimate justice."

Westchester responds that Liberty Mutual is equally liable for the costs of the Underlying Litigation because: (1) The Liberty Mutual Policy is a primary policy and not a "true excess" policy at the same level of risk as the Westchester Policy; (2) Liberty Mutual was on notice of the Underlying Lawsuit from its onset and yet refused to pay any sums toward the defense or indemnity toward its insured's loss; (3) Tractel was contractually required to provide general liability insurance and the Liberty Policy afforded such coverage; (4) the Underlying Litigation stemmed from offsite operations; and (5) Tractel's liability for strict products liability for the activities that were intended to be covered under the Liberty Policy were the predominant basis compelling a settlement in the Underlying Lawsuit. Argument (2) is irrelevant, and the others are answered by the discussion in Section I, above.

In sum, the Liberty Mutual Policy generally insured Tractel as a primary policy but responds as excess insurance in instances in which Tractel was also covered by a wrap-up policy. Liberty Mutual, by the language of its policy, was not required to pay toward the defense or indemnity of the loss because there was not excess past the limits of the Westchester Policy. Though Tractel was required to provide general liability insurance for the project, it had to do so in addition to the wrap-up policy, which acts as a way for an owner to consolidate risk and avoid insurance litigation over which policy should cover what loss. Westchester received the benefit of premiums from all the contractors and subcontractors on the Arterra Project. That it had to pay the costs of the primary coverage it provided for Tractel is not unjust; it is what it contracted to do. Westchester expressly disavowed the "product defect" defense as a coverage position and cannot now revive it merely for the sake of this litigation for equitable consideration. The accident occurred on-site and did not stem from off-site activities. Westchester is not entitled to equitable contribution from Liberty Mutual.

## CONCLUSION

For the reasons stated above, I GRANT Liberty Mutual's motion for summary judgment. Westchester is not entitled to equitable contribution from Liberty Mutual for settlement and

defense costs of the Underlying Litigation, and I DENY Westchester's motion.  Judgment shall be entered accordingly.

**IT IS SO ORDERED.**

Dated: February 22, 2018

William H. Orrick
United States District Judge